**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

**UNITED STATES OF AMERICA,**

                    **Plaintiff(s),**          **CASE NUMBER: 05-80025**
                                                **HONORABLE VICTORIA A. ROBERTS**
**v.**

**D-1 TIMOTHY DENNIS O'REILLY**,

                    **Defendant(s).**
_____/

**ORDER**
(REGARDING DOCUMENT #212)

**I.      INTRODUCTION**

        This matter is before the Court on Defendant Timothy O'Reilly's "Motion to

Suppress Oral Statements and for Evidentiary Hearing."  (Doc. #212).  Defendant

O'Reilly ("O'Reilly") asks the Court to conduct an Evidentiary Hearing and suppress the

45-minute tape recording of incriminating statements made to Barron Nix-Bey ("Nix-

Bey") and all other statements made to Nix-Bey after he became, in O'Reilly's words,

"an agent" for the federal Government.  Oral argument was heard on January 28, 2008.

        For the following reasons, O'Reilly's motion is **DENIED**.

**II.     BACKGROUND**

        On February 12, 2004, co-defendant Norman Duncan ("Duncan") was arrested

for his alleged involvement in an armored car robbery in Highland Park.  Duncan was

also under investigation for other unsolved armored car robberies.  On February 18,

2004, Special Agents Angela N. Ryan ("SA Ryan") and Terry Booth of the Federal

1

Bureau of Investigation ("FBI") received information from the Detroit Police Department ("DPD") that a confidential source identified O'Reilly as a perpetrator in the Dearborn Federal Credit Union ("DFCU") robbery/murder. The FBI interviewed Duncan regarding his participation in the DFCU robbery/murder and his knowledge of O'Reilly's participation. Duncan denied he participated and said he was unaware of O'Reilly's involvement. A polygraph examination verified this information.

Meanwhile, on February 6, 2004, O'Reilly had begun to serve a two-year sentence at the Ryan Correctional Facility ("RCF") for possession of firearms.

O'Reilly believes two FBI agents questioned him at RCF in that month about: (1) Duncan; (2) a victim in one of the armored car robberies, Eddie Cromer; (3) his firearms; (4) various other armored car robberies; and (5) fingerprints found in a minivan. O'Reilly says the agents conducted the interview without giving him his *Miranda* rights. According to O'Reilly, the agents told him they were looking for information that would implicate Duncan in other armored car robberies and that would "clear" him. Before the interview concluded, O'Reilly agreed to provide his palm prints.

At RCF, Nix-Bey assisted O'Reilly with a motion to challenge a pending state charge for stealing a firearm. On July 7, 2004, Nix-Bey and O'Reilly became cell mates. The parties are unsure of whether this arrangement occurred before or after Nix-Bey began working on the motion. In any event, on July 25, 2004, Nix-Bey wrote a letter to the DPD stating he overheard O'Reilly tell another inmate that he participated in the DFCU robbery/murder and other armored car robberies. The DPD forwarded the letter to FBI Special Agent Barry Higginbotham ("SA Higginbotham").

On August 10, 2004, SA Ryan and SA Higginbotham interviewed Nix-Bey at

RCF. He confirmed the information in his letter and provided additional information regarding O'Reilly's alleged involvement in armored car robberies (presumably based on more conversation).

Nix-Bey asked to continue to confidentially report his conversations with O'Reilly to the FBI.

On September 2, 2004, SA Ryan, SA Higginbotham, and Special Agent Kerry F. McCafferty ("SA McCafferty") interviewed Nix-Bey at the DPD. He indicated O'Reilly was still bragging about his participation in the DFCU robbery/murder and had mentioned other alleged participants. O'Reilly says Nix-Bey also reported for the first time that O'Reilly said he was one of the shooters.

Nix-Bey contacted SA Higginbotham on September 7, 2004 and September 14, 2004 to provide him with still more information regarding O'Reilly's alleged involvement in the DFCU robbery/murder.

Next, on September 22, 2004, the United States Marshals Service brought Nix-Bey to federal court for a debriefing and interview with SA Higginbotham and Assistant United States Attorney Diane L. Marion. Nix-Bey was then briefed on the operation of his radio that the FBI electronically altered to record conversations. Nix-Bey agreed to tape his conversations with O'Reilly at RCF in this manner. On his return to RCF, he was placed in segregation for his own protection either because a guard publically stated he was wearing a wire, or because he had cash against prison policy. Suffice it to say, Nix-Bey never recorded any conversations with O'Reilly while they were both still at RCF.

On September 29, 2004, Nix-Bey appeared before a Federal Grand Jury. He

testified to his conversations with O'Reilly concerning the DFCU robbery/murder and other robberies. Nix-Bey was returned to the segregation unit of RCF. There, he wrote O'Reilly a letter to find out where he should send the motion he prepared on O'Reilly's behalf. Nix-Bey indicated that if O'Reilly did not respond, he would throw the motion in the garbage. However, "Return to Sender" is circled on the envelope, to suggest this letter was returned to Nix-Bey.

Nix-Bey was eventually transferred to the Macomb Correctional Facility ("MCF"). At some point, Nix-Bey had contacted SA Higginbotham and told him what O'Reilly allegedly did with his proceeds from the DFCU robbery/murder. However, on November 15, 2004, Nix-Bey told SA Higginbotham his previous information was incorrect, and Nix-Bey gave additional insight – allegedly gleaned from O'Reilly – into the DFCU robbery/murder.

Nix-Bey kept in contact with O'Reilly. In one letter, Nix-Bey referred to himself as the "Big Daddy" and assured O'Reilly he was safe because he "sent word [to RCF] (where O'Reilly was still housed), and told them guys not to jump on [him]."

On November 1, 2004, the Oakland County Circuit Court granted O'Reilly's "Motion to Dismiss for 180-day Violation" on his pending state charge for stealing a firearm. O'Reilly says this relief made him eligible for a level I facility, but he was never transferred to a lower-level institution. Instead, Special Agent Daniel D. Roberts of the FBI wrote Warden Raymond Booker at RCF and requested that O'Reilly be transferred to MCF so Nix-Bey could record him. In addition, SA Higginbotham sought the assistance of the Michigan Department of Corrections ("MDOC"). On November 17, 2004, the MDOC agreed to immediately transfer O'Reilly to its Marquette prison after

4

Nix-Bey obtained the tape recording. O'Reilly says this is evidence of collusion between federal and state authorities and of the federal agents' attempts to manipulate, control, and direct his custodial status.

On December 6, 2004, SA Higginbotham and Special Agent Christopher J. Hess debriefed and interviewed Nix-Bey at MCF. He was instructed to re-establish a relationship with O'Reilly when he arrived at MCF and obtain incriminating statements concerning the DFCU robbery/murder. Nix-Bey said he would, and he agreed to use the modified prison radio to record conversations.

O'Reilly did arrive at MCF on December 8, 2004. On December 14th, O'Reilly and Nix-Bey spoke at a picnic table in the prison yard. O'Reilly made incriminating statements that Nix-Bey recorded. The following day, Nix-Bey informed SA Higginbotham that the recording was successful. SA Higginbotham and SA McCafferty obtained Nix-Bey's radio on December 16, 2004 from MCF and sent it to the FBI office in Detroit.

On December 17th, SA Higginbotham filed a Criminal Complaint in federal court, alleging that O'Reilly and certain co-defendants violated 18 U.S.C. §§ 2113(a), 924(c), and 924(j). On January 11, 2005, a Federal Grand Jury indicted O'Reilly and co-defendants on two counts of conspiracy, two counts of bank robbery, and two counts of using and carrying a firearm during a crime of violence.

## III.    ARGUMENTS AND ANALYSIS

### A. Sixth Amendment

The Sixth Amendment says, "In all criminal prosecutions, the accused shall enjoy

the right . . . to have the Assistance of Counsel for his defense."

O'Reilly says his Sixth Amendment right to counsel attached when Nix-Bey recorded their conversation because the FBI: (1) focused its investigation on him months before Nix-Bey was involved; (2) controlled and manipulated his custodial assignments solely to initiate and tape a conversation between O'Reilly and Nix-Bey; (3) specifically instructed Nix-Bey to interrogate O'Reilly in the "custodial environment ultimately controlled by the federal government"; (4) purposefully delayed charges until after Nix-Bey obtained a tape-recorded confession even though there was enough evidence to arrest him before the recording; and (5) used Nix-Bey to surreptitiously extract a confession from O'Reilly.

The Court disagrees.

O'Reilly relies on *Massiah v. United States*, 377 U.S. 201 (1964); *United States v. Henry*, 477 U.S. 264 (1980); and *Escobedo v. Illinois*, 378 U.S. 478 (1964). However, the United States Supreme Court found the defendants in *Massiah* and *Henry* were entitled to Sixth Amendment protection because they had already been indicted when they confessed. *See Massiah*, 377 U.S. at 206; *Henry*, 477 U.S. at 270.

O'Reilly was not entitled to the assistance of counsel because he was not indicted for the DFCU robbery/murder when he made incriminating statements to Nix-Bey that were recorded. *See Illinois v. Perkins*, 496 U.S. 292, 299 (1990). The *Perkins* Court cited *Massiah*, *Henry*, and *Maine v. Moulton*, 474 U.S. 159 (1985) for the proposition that the Sixth Amendment prevents the Government from interfering with a defendant's right to counsel *after charges have been filed*. *Perkins*, 496 U.S. at 299. O'Reilly says the facts of his case go beyond *Perkins*, but the Supreme Court stated a

bright-line rule and made clear that when "[n]o charges [have] been filed on the subject of the interrogation, . . . Sixth Amendment precedents are not applicable." *Id.*

On the other hand, the Supreme Court found the defendant's Sixth Amendment right was violated in *Escobedo* because: (1) the investigation focused on the defendant; (2) the defendant was taken into police custody; (3) the police interrogated him without *Miranda* warnings; and (4) the police denied him the opportunity to consult with his attorney after he asked to speak with him numerous times. *See Escobedo*, 378 U.S. at 490-91.

Here, while the investigation had focused on O'Reilly, and he was in state custody, O'Reilly was not interrogated by the police, and he never asked for an attorney *Escobedo* is distinguishable.

Further, "[i]n a line of constitutional cases in [the Supreme Court], it has been firmly established that a person's Sixth . . . Amendment right to counsel attaches only at or after the time that adversary judicial proceedings have been initiated against him." *Kirby v. Illinois*, 406 U.S. 682, 688 (1972). The Court acknowledged it previously held that a defendant has a constitutional right to counsel before trial, but stated "*all* of those cases have involved points of time at or after the initiation of adversary judicial criminal proceedings – whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." *Id.* at 689 (emphasis in original). No adversary judicial proceedings for the DFCU robbery/murder had begun when O'Reilly made incriminating statements.

**B. Fifth Amendment**

O'Reilly argues his Fifth Amendment rights were violated because he was interrogated in custody without *Miranda* warnings. The Court finds *Miranda* warnings were not required.

"[W]hen an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning, the privilege against self-incrimination is jeopardized. Procedural safeguards must be employed to protect the privilege[.]" *Miranda v. Arizona*, 384 U.S. 436, 478-79 (1966). "Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Id.* at 444.

However, "*Miranda* was not meant to protect suspects from boasting about their criminal activities in front of persons whom they believe to be their cellmates." *Perkins*, 496 U.S. at 298. The *Perkins* Court rejected the argument that *Miranda* warnings are required whenever a suspect is in custody and converses with someone who happens to be a Government agent, holding that "[c]onversations between suspects and undercover agents do not implicate the concerns underlying *Miranda*. The essential ingredients of a 'police-dominated atmosphere' and compulsion are not present when an incarcerated person speaks freely to someone whom he believes to be a fellow inmate." *Id.* at 296.

Nix-Bey was not a Government agent. He initiated contact with the FBI and was not offered compensation or a reduced sentence for his information. Nevertheless, even presuming he was an agent at the time he recorded O'Reilly's statements, *Miranda* and *Perkin*s allow the admission of the recording. O'Reilly spoke freely about

his criminal activities to someone he believed to be his cell mate. *Perkins* bars
O'Reilly's Fifth Amendment claim.

### C. Involuntary Confession

Relying on *Arizona v. Fulminante*, 499 U.S. 279 (1991) and 18 U.S.C. §3501,
O'Reilly argues the Court is obligated to hold an Evidentiary Hearing, and that hearing
will convince the Court to suppress his confession because it was compelled and
involuntary. *See Lego v. Twomey*, 404 U.S. 477, 478 (1972) (stating only voluntary
confessions are admissible).

In *Fulminante*, the defendant befriended another inmate, a paid informant for the
FBI. *Fulminante*, 499 U.S. at 282-83. The informant knew the defendant was "starting
to get some tough treatment" from other inmates because of a rumor that he killed a
child. The defendant confessed to the murder only after the informant offered to protect
him if he did so. *Id.* at 283. The trial court found the confession to be voluntary, but the
appellate court said it was coerced. *Id.* at 284.

The United States Supreme Court agreed with the appellate court based on the
informant's position as defendant's friend and defendant's: (1) fear of physical violence;
(2) low intelligence; (3) short stature; (4) slight build; and (5) inability to adapt to prison
life. *Id.* at 286 n.2 and 287-88.

O'Reilly says *Fulminante* does not establish a bright-line test. Instead, he argues
the Court must analyze the voluntariness of his confession under the totality of the
circumstances. O'Reilly says under the totality of the circumstances, his confession
should be suppressed because Nix-Bey – a person he depended on for his intelligence

and protection – coerced him to confess. However, the totality of these circumstances do not trigger a *Fulminante* violation. There is no evidence to show O'Reilly had low intelligence, and a letter from Nix-Bey to O'Reilly assuring his safety is not sufficient to prove O'Reilly needed protection. There is also no evidence that O'Reilly encountered actual violence or that he received a credible threat of physical violence from other inmates such that his "will was overborne in such a way as to render his confession the product of coercion." *See id.* at 287-88

In addition, the Court cannot honor O'Reilly's request to suppress his statements based on 18 U.S.C. §3501. While it is non-exhaustive, section 3501 provides a list of factors Congress wanted courts to take into account in evaluating the voluntariness of a defendant's confession:

> The trial judge in determining the issue of voluntariness shall take into consideration all the circumstances surrounding the giving of the confession, including (1) the time elapsing between arrest and arraignment of the defendant making the confession, if it was made after arrest and before arraignment, (2) whether such defendant knew the nature of the offense with which he was charged or of which he was suspected at the time of making the confession, (3) whether or not such defendant was advised or knew that he was not required to make any statement and that any such statement could be used against him, (4) whether or not such defendant had been advised prior to questioning of his right to the assistance of counsel; and (5) whether or not such defendant was without the assistance of counsel when questioned and when giving such confession.

18 U.S.C. §3501(b).

However, section 3501 did not overrule *Miranda v. Arizona*, 384 U.S. 436 (1966). *Dickerson v. United States*, 530 U.S. 428, 432 (2000). "*Miranda* . . . govern[s] the admissibility of statements made during custodial interrogation in both state and federal courts." *Id.* Thus, section 3501 "must yield to *Miranda*'s more specific requirements."

*Id.* at 437. The Court already determined O'Reilly's statements will not be suppressed based on *Miranda*; 18 U.S.C. §3501 does not change this result.

### D. Fed. R. Crim. P. 5(a)

Under Fed. R. Crim. P. 5(a), "A person making an arrest within the United States must take the defendant without unnecessary delay before a magistrate judge, or before a state or local judicial officer . . . ."

O'Reilly relies on *Anderson v. United States*, 318 U.S. 350 (1943) to support his argument that the Court should suppress his statements based on a violation of Fed. R. Crim. P. 5(a). In *Anderson*, a copper company's operations were interrupted by the dynamiting of four power lines and two steel towers. After the FBI began its investigation, the local sheriff arrested individuals he suspected of participating in the dynamiting. Instead of taking the individuals before a magistrate as required by state law, state officials held them at the company-owned Y.M.C.A. *Anderson*, 318 U.S. at 352. The FBI questioned them over a period of six days; some made incriminating statements. *Id.* at 353. The United States Supreme Court held the statements were inadmissible because there was a working arrangement between the FBI and the local sheriff. The Court held the individuals were required to be presented to a magistrate before any questioning began. *Id.* at 355-56.

O'Reilly argues that just like *Anderson*, agents did not promptly take him into federal custody and instead collaborated with the MDOC to control his prison arrangements simply to obtain incriminating statements. O'Reilly fails to point out an important distinction between himself and Anderson: Anderson was under arrest at the

time of delay.  O'Reilly was not arrested on a federal offense.  Further, he was not

questioned by a federal agent, for the reason the Court has already concluded Nix-Bey

was not a Government agent.  Hence, there was no obligation to present O'Reilly to a

magistrate or other judicial officer before he confessed.  According to the United States

Supreme Court:

> [T]here can be no "delay" in bringing a person before a federal magistrate
> until, at a minimum, there is some obligation to bring the person before
> such a judicial officer in the first place.  Plainly, a duty to present a person
> to a federal magistrate does not arise until the person has been arrested
> for a *federal* offense.

*United States v. Alvarez-Sanchez*, 511 U.S. 350, 358 (1994) (emphasis in original).

The exception to this rule is "if state or local authorities, acting in collusion with federal

officers, were to arrest and detain someone in order to allow the federal agents to

interrogate him in violation of his right to a prompt federal presentment."  *Id.* at 359; *see*

*also Anderson*, 318 U.S. at 356 and *United States v. Coppola*, 281 F.2d 340, 344 (2nd

Cir. 1960):

> If this cooperation (between the state police and the FBI) reached the
> point of arrest and detention by local police for the purpose of enabling
> federal officers to question the defendants concerning the bank robberies
> for a period of time forbidden to federal officers by Rule 5(a) of the Federal
> Rules of Criminal Procedure, admissions thus obtained would properly be
> excluded.  The rule excludes confessions when the "working arrangement"
> includes [] illegal detention – in other words, when federal law
> enforcement officers [] hold the defendant illegally so that they may secure
> a confession.

Although he was in custody, O'Reilly was not held by state authorities for the

benefit of interrogation by FBI agents.  Further, when O'Reilly was arrested on the state

charge, authorities were not aware of his potential involvement in the DFCU

robbery/murder, and the FBI was not involved.  In addition, although the FBI asked the

12

MDOC to transfer O'Reilly to a particular facility so Nix-Bey could obtain a tape recording, there is no evidence that a collusive arrangement between state and federal agents caused O'Reilly to confess. *See Alvarez-Sanchez*, 511 U.S. at 360.

Finally, O'Reilly's confession did not result from police interrogation, and "[r]ule 5(a) is not a formality; its purpose is to minimize secret police interrogation of persons under detention; its ultimate aim is to avoid those situations out of which grows the whole system of the 'third degree.'" *Coppola v. United States*, 365 U.S. 762, 765 (1961).

## IV.    CONCLUSION

O'Reilly has not established a need for an Evidentiary Hearing. The Court finds as a matter of law that: (1) O'Reilly's Sixth Amendment protections did not arise until he was taken into custody on federal charges; (2) at no point in time did Nix-Bey serve as a Government agent that would trigger Fifth Amendment or other constitutional protections for O'Reilly; (3) O'Reilly's confession was voluntary and made prior to arrest; (4) no collusiveness is established between federal and state agents that triggers a conclusion that O'Reilly was in federal custody prior to the filing of the federal criminal complaint; and (5) 18 U.S.C. §3501 and Fed. R. Crim. P. 5(a) are inapplicable.

O'Relly's motion is **DENIED**.

**IT IS ORDERED**.

s/Victoria A. Roberts
Victoria A. Roberts
United States District Judge

Dated: February 1, 2008

The undersigned certifies that a copy of this document was served on the attorneys of record by electronic means or U.S. Mail on February 1, 2008.

s/Linda Vertriest
Deputy Clerk