**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

**UNITED STATES OF AMERICA,**

        Plaintiff(s),          **CASE NUMBER: 05-80025
HONORABLE VICTORIA A. ROBERTS**

v.

**D-1 TIMOTHY DENNIS O'REILLY,**

        Defendant(s).
_____/

**ORDER DENYING WITHOUT PREJUDICE DEFENDANT'S
MOTION TO EXCLUDE THE TESTIMONY AND RECORDING OF BARRON NIX-BEY**

**I.    INTRODUCTION**

This matter is before the Court on Timothy O'Reilly's "Motion to Exclude the Testimony and Recording of Barron Nix-Bey Due to the Prosecution's Failure to Obtain and/or Retain Exculpatory Evidence from Him." (Doc. #492). O'Reilly says the Government's failure to obtain the notes Nix took regarding conversations he had with O'Reilly violates *Brady v. Maryland*, 373 U.S. 83 (1963); the Jencks Act, 18 U.S.C. §3500; and his Fifth, Sixth, and Eighth Amendment rights. An Evidentiary Hearing was held on July 9, 2010. (At the hearing, Mr. Nix informed the Court that he no longer uses the name "Nix-Bey." Except where he is quoted, references in this Order will be to "Nix.")

O'Reilly says the Court must exclude Nix's testimony, the audio recording of a conversation Nix had with O'Reilly, and the transcript of the recording.

The Court finds O'Reilly abandoned his Eighth Amendment argument. While he

1

mentions that his Eighth Amendment rights were violated, he does not expand on that argument.

O'Reilly's motion is **DENIED**.

## II. BACKGROUND

On February 6, 2004, O'Reilly began serving a two-year sentence at the Ryan Correctional Facility ("RCF") for possession of firearms. Eventually, Nix and O'Reilly became cell mates.

On July 25, 2004, Nix wrote a letter to the Detroit Police Department ("DPD"). He stated he overheard O'Reilly tell another inmate that he participated in the Dearborn Federal Credit Union ("DFCU") robbery/murder and other armored car robberies. The DPD forwarded the letter to FBI Special Agent Barry Higginbotham, who received the letter on August 6, 2004. Nix testified that this letter incorporated the one page of notes he took regarding O'Reilly's alleged involvement in the DFCU robbery/murder.

On August 10, 2004, Special Agent Angela N. Ryan and SA Higginbotham interviewed Nix at RCF. Nix said O'Reilly told him his cousin killed Norman Anthony Stephens during the DFCU robbery/murder. Nix requested to continue to confidentially report his conversations with O'Reilly to the FBI. SA Higginbotham asked Nix to be a good, active listener, and to take notes of the conversations, if possible. SA Higginbotham testified that he asked Nix to take notes for his own purposes only, so that he could refresh his memory and accurately convey information to SA Higginbotham when they spoke. Nix continued to take notes of information O'Reilly provided.

On September 2, 2004, SA Ryan, SA Higginbotham, and Special Agent Kerry F.

McCafferty interviewed Nix at the DPD. Nix said O'Reilly told him O'Reilly shot Stephens because he tried to draw his gun, and O'Reilly believed Kevin Watson fired the fatal shot into Stephens, which also tore up Stephens' hand.

In a letter to SA Higginbotham that should have been dated September 2, 2004, but was incorrectly dated August 2, 2004, Nix says:

> you stated [I] basically hav'nt[sic] told you anything that you didn't no[sic] and you would need some hard evidence before you contact the Parole Board on my behalf[.]
>
> Mr. Higginbotham, [I] contacted you because the subject keep[sic] bragging about it and if it was true [I] figure[d] it would be a break through for you and I could be awarded, for suppling[sic] the information to you but so far, it was been the opposite[.]
>
> . . .
>
> Since we started this, I have supplied you with information as he tells me, not what [I] make up. . . . I told you that [I] can get any information out of him that will help you in his conviction, without him suspecting anything because he tell[s] me anything [I] want to know, well basically everything and you tell me, by putting a[n] effort to get him on tape and all what [I] gave you so far, is not good enough for you to notified[sic] the Parole Board?
>
> I though[t] the first step in this kind of relationship was trust.
>
> . . .
>
> I know [I] can get him to say he kill[ed] the guard, who was all with him, who did what, what did he do wit[h] his shotgun and etc.
>
> I know [I] can do my part, what about you.

On September 14, 2004, Nix called SA Higginbotham, and told him that O'Reilly said he shot Stephens twice while Stephens was standing, but that Watson shot Stephens when he tried to get up from the pavement. This is the same shot that severely damaged Stephens' hand.

3

Nix had a second conversation with SA Higginbotham on September 14, 2004 in which he supplied him additional information about the DFCU robbery/murder, after Nix checked his notes.

SA Higginbotham and Assistant United States Attorney Diane L. Marion debriefed and interviewed Nix on September 22, 2004. Nix said O'Reilly bragged about firing a 12-gauge Mossberg shotgun twice during the DFCU robbery/murder, and said Watson fired a shotgun round which killed Stephens.

On October 25, 2004, Nix called SA Higginbotham and gave him additional information, but on November 15, 2004, Nix told SA Higginbotham he checked his notes concerning conversations with O'Reilly, and realized he provided SA Higginbotham erroneous information on October 25th.

On December 6, 2004, SA Higginbotham and Special Agent Christopher J. Hess debriefed and interviewed Nix at the Macomb Correctional Facility ("MCF"), where Nix had been transferred. Nix was advised that pursuant to his request to cooperate, Nix should attempt to re-establish a relationship with O'Reilly when O'Reilly arrived at MCF, and get O'Reilly to make incriminating statements concerning O'Reilly's participation in the DFCU robbery/murder. Nix agreed to use his prison radio that was electronically altered by the FBI, to record conversations with O'Reilly. None of his previous conversations with O'Reilly had been recorded.

On December 6, 2004, Nix called SA Higginbotham and provided him still more information about the DFCU robbery/murder.

O'Reilly arrived at MCF on December 8, 2004. On either December 13, 2004 or December 14, 2004, O'Reilly and Nix spoke at a picnic table in the prison yard. It was

then that O'Reilly made the incriminating statements that Nix recorded:

Bey: Let me ask you this. You don't feel. Now you, you a killer so you don't feel the amosity[sic]. I'm sayin', but you don't feel anything by, what ya'll, you and Kevin shot that guard, you don't feel no kinda loyalty to say . . .

O'Reilly: See it's, it's what has happened. His action caused by reaction.

Bey: What do you mean his action?

O'Reilly: His action to reach for his gun.

Bey: Huh?

O'Reilly: When we came up, we're like, get the fuck down. The other guy tossed his gun, and laid flat, right?

Bey: Okay.

O'Reilly: He was okay, we didn't fuck with him.

Bey: (Laughs)

O'Reilly: All right? This guy went to reach it, so we started blastin' him, right?

. . .

Bey: Okay I understand, him or you, but, you, you said that you, at first, you shot him two times, right, and he fell to the ground. He, he was goin' to the ground and like he was reachin', he went to the ground.

O'Reilly: Yeah.

Bey: And you shot him two time[s].

O'Reilly: Again, he, he tried to reach again, he wasn't trying to grab his wound or anything, he tried to reach again for the other gun.

Bey: Okay but you shot him two times, okay, and he fell to the ground. What made Kevin shoot him?

O'Reilly: No Kevin, Kevin shot him first when he went to the ground.

Bey: Oh Kevin shot him when he first went to the ground and you turn around.

5

| | |
|---|---|
| O'Reilly: | And then he tried to reach again so I just followed up, I opened right up. |
| Bey: | (Laughs) So Kevin shot him the first time then, you shot and he followed up and shot him first time. |
| O'Reilly: | And he died because of complications. |

. . .

| | |
|---|---|
| O'Reilly: | He chose that. He chose his route. |
| Bey: | How could somebody chose[sic] to die, man? |
| O'Reilly: | He reached for his gun. |
| Bey: | Okay but say no [sic]. |
| O'Reilly: | Hey, someone said to you, and say get the fuck on the ground and they got a gun. |
| Bey: | Uh huh |
| O'Reilly: | You get the fuck on the ground. You might live. |
| Bey: | Uh huh. |
| O'Reilly: | But, if you resist, and try to reach for a weapon. |
| Bey: | So. |
| O'Reilly: | They gonna blast you. |
| Bey: | Okay, do the thing, he resisted, and get on the ground and give up the money, whatever, that made ya'll say fuck (unintelligible) so you chose. So you sayin', you decide who live or die, then, that what you sayin' right? At that point, you decided who lives or die right? |
| O'Reilly: | I didn't decide he was gonna die. I decided I was gonna shoot him. |
| Bey: | Okay, you shot him and killed him. |
| O'Reilly: | Ain't the first time and it won't be the last (laughs). |

Nix informed SA Higginbotham that the recording was successful. SA

Higginbotham and SA McCafferty obtained Nix's radio from MCF and sent it to the FBI in Detroit.  The FBI did not take possession of Nix's notes.

On May 2, 2010, defense counsel asked the Government to produce all of Nix's notes.  Following this request, the FBI interviewed Nix.  Nix told them that he was instructed by SA Higginbotham to take notes regarding O'Reilly and the crimes he allegedly committed, which Nix did until he made the December 2004 recording.  Nix says his notes included names, dates, specifics of the crimes committed, and anything else to do with O'Reilly.  Nix says he used all of the information in his notes to write a letter, but he does not remember what he did with the notes.  Nix indicated he would look for his notes.  He informed Special Agent Todd C. Reineck on May 10, 2010, that he could not find them.

In all, it appears that Nix had four meetings with FBI agents by the end of December 2004, four telephone communications, and sent two letters.  FBI Reports were filed in connection with all of the meetings and telephone calls.

Nix's present memory was demonstrated to be sorely lacking at the hearing on July 9, 2010.  He adopted all of the information in the FD-302s.  He testified that he had read them on July 8, 2010, they accurately reflect what he told SA Higginbotham in 2004, and they contain everything that was in his own notes.

### III.   APPLICABLE LAW AND ANALYSIS

#### A.   *BRADY* VIOLATION

"[A] Brady violation may . . . occur when the prosecution fails to disclose exculpatory material in response to a pretrial motion.  The violation may take place at

that time, but Brady may be invoked only when the trial has been completed." *United States v. Short*, 671 F.2d 178, 187 (6th Cir. 1982); *see also United States v. Moore*, 439 F.2d 1107, 1108 (6th Cir. 1971) ("Brady was never intended to create pretrial remedies" (citation omitted). Accordingly, O'Reilly's *Brady* argument is premature.

Assuming O'Reilly's *Brady* argument could be addressed at this juncture, *Brady* requires the Government to disclose exculpatory and impeachment evidence that is "material either to guilt or to punishment." *Strickler v. Greene*, 527 U.S. 263, 280 (1999) (quoting *Brady*, 373 U.S. at 87).

> There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.

*Strickler*, 527 U.S. at 281-82. "The defendant has the burden of proving a *Brady* violation." *Butler v. Renico*, 2007 WL 579533 at \*\*4 (6th Cir. Feb. 20, 2007) (citing *Carter v. Bell*, 218 F.3d 581, 601 (6th Cir. 2000)).

While the Government will call Nix as a witness during the guilt phase, and will seek to admit the audio recording during that phase, O'Reilly seems to concede this evidence, and Nix's notes, are not material to his guilt. *See* O'Reilly's Reply to the Government's Supplemental Response, p.3 ("the evidence of guilt is overwhelming without Nix-Bey's testimony and tape"); O'Reilly's Reply in Response to the Government's Position Regarding a Letter from Baron[sic] Nix-Bey to the FBI, p.1 ("this evidence might not influence the guilt innocence verdict"); O'Reilly's Response to the Court's Request for Supplemental Briefing, p.9 ("the audiotape created by Government agent Nix-Bey is not crucial to the Government's case on guilt").

8

So, the question is whether Nix's notes are material to his punishment. On this, the Court makes the following findings: (1) O'Reilly did not meet his burden to demonstrate that Nix's notes are favorable to him; (2) Nix was a government agent for *Brady* purposes; (3) the Government had a duty to obtain Nix's notes; and (4) without hearing all the evidence, the Court cannot know with certainty whether O'Reilly will be prejudiced by the Government's inability to produce Nix's notes.

### 1. Are Nix's Notes Favorable to O'Reilly?

Nix's notes are favorable to O'Reilly, if they contain exculpatory information, or if they undermine Nix's credibility. *See Strickler*, 527 U.S. at 282.

O'Reilly says Nix's notes contain exculpatory information because they reflect the manner in which Nix's story shifted over time to satisfy the Government's needs, and they detail the inconsistencies in what O'Reilly told Nix. However, Nix's testimony did not bear this out. He recalled his notes were brief, not more than a couple of pages, contained no content other than what O'Reilly told him, and nothing beyond names, dates, and crime details. This is information that may be more inculpatory, rather than exculpatory. O'Reilly provided no evidence to the contrary.

O'Reilly made no showing that Nix's notes contained information favorable to him. Without anything more than his speculation, it appears that O'Reilly cannot meet his burden on this first prong.

Nonetheless, the Court addresses the remaining prongs of a *Brady* violation.

### 2. Were the Notes Suppressed by the Government?

"[T]he individual prosecutor has a duty to learn of any favorable evidence known

9

to the others acting on the government's behalf in the case[.]" *Kyles v. Whitley*, 514 U.S. 419, 437 (1995). If the Government withholds evidence within its control, the suppression prong of *Brady* is met. *See United States v. Graham*, 484 F.3d 413, 417 (6th Cir. 2007).

To determine whether Nix was a government agent, and therefore, whether the Government had a duty to collect Nix's notes, the Court looks at the control that the Government had over him. *See id.* at 417-18; *see also United States v. Li*, 55 F.3d 325, 328 (7th Cir. 1995)). An individual acting on his own initiative is not a government agent. *See United States v. Malik*, 680 F.2d 1162, 1165 (7th Cir. 1982).

While Nix acted on his own initiative when he wrote the July 25, 2004 letter, his status morphed into government agent beginning August 10, 2004, when the Government told Nix to be a good, active listener; and, to take notes of conversations he had with O'Reilly. Nix's September 2, 2004 letter (incorrectly dated as August 2, 2004) is further evidence that Nix was under the Government's control. In it, he attempted to satisfy the Government so the Government would contact the Parole Board on his behalf. From this letter, it appears there had been a "quid pro quo" discussion between Nix and SA Higginbotham, and SA Higginbotham told Nix he needed "hard evidence." Finally, on December 6, 2004, the Government told Nix to re-establish a relationship with O'Reilly, and get him to make incriminating statements. The Government transformed Nix's prison radio into a recording device to assist him in this task. The FBI also paid for Nix's transitional housing in 2005, after his release from prison, approximately $200 per month for several months. The Government did, in fact, write a letter to the Parole Board on his behalf on February 2, 2005.

The Court acknowledges that in its February 1, 2008 Order, it held that Nix was not a government agent for Fifth and Sixth Amendment purposes. *See* Doc. #310. That ruling does not change. At the time Nix made the recording, O'Reilly was not under indictment, which would have triggered Sixth Amendment protections. He also was not in custody, speaking to someone he knew to be a government agent, which would have triggered Fifth Amendment protections. Whether Nix was an agent for *Brady* purposes was not before the Court in 2008.

To the extent O'Reilly still claims his recording must be suppressed because of a Fifth or Sixth Amendment violation, the Court declines this request.

The Court otherwise finds that Nix was a government agent when the recording was made, and the Government had an obligation to ascertain if there was anything favorable to O'Reilly in Nix's notes.

### 3. Will O'Reilly be Prejudiced by the Government's Inability to Produce Nix's Notes?

"[F]avorable evidence is material, and constitutional error results from its suppression by the government, 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Kyles*, 514 U.S. at 433 (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)).

> The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A "reasonable probability" of a different result is accordingly shown when the government's evidentiary suppression "undermines confidence in the outcome of the trial."

*Kyles*, 514 U.S. at 434 (quoting *United States v. Bagley*, 473 U.S. 667, 678 (1985)).

O'Reilly says the audio recording and transcript are the only evidence the Government has to support one of the non-statutory aggravating factors listed in the Notice of Intent to Seek the Death Penalty: "Defendant shot Norman Stephens from behind, and while Stevens[sic] was already wounded and on the ground." O'Reilly says the documents provided in discovery show O'Reilly told Nix, that Watson killed Stephens, and that this conflicts with the audio recording. O'Reilly says Nix's notes may contain additional inconsistencies that rebut the Government's non-statutory aggravating factor, and lead to a reasonable probability that O'Reilly will receive a life sentence rather than the death penalty.

The Court heard some, but not all, of the evidence that may come out at trial on this issue. Prejudice has not yet been established.

Assuming a penalty phase is necessary, and assuming O'Reilly receives the death penalty, without hearing all the evidence that both sides will present at the penalty phase, the Court cannot determine with certainty whether the Government's inability to produce Nix's notes will undermine confidence in the penalty phase. The Court cannot know now, whether O'Reilly will receive the death penalty, and what, if any, aggravating factors the jury may find beyond a reasonable doubt.

However, O'Reilly is in the best position to know what he told Nix during their conversations, and he does not allege or present any evidence that his conversations with Nix included additional inconsistencies, including different accounts of how Stephens was killed. More importantly, O'Reilly has documents to rebut the Government's claim that O'Reilly killed Stephens; he certainly can use those to argue in favor of a sentence of life without parole.

As stated at the outset, *Brady* can only be invoked when trial is complete. O'Reilly's *Brady* challenge is denied without prejudice.

### B. VIOLATION OF THE JENCKS ACT

There can be no Jencks Act violation now; the "clear and consistent" rule of the Sixth Circuit is that the Government may not be compelled to disclose Jencks Act material before trial. *United States v. Presser*, 844 F.2d 1275, 1283 (6th Cir. 1988) (citations omitted). "[N]o statement . . . in the possession of the United States which was made by a Government witness . . . shall be the subject of subpoena, discovery, or inspection until said witness has testified on direct examination in the trial of the case." 18 U.S.C. §3500(a).

Nonetheless, the Court addresses whether, after Nix testifies, the Government's already stated inability to produce Nix's notes, and certain FD-302s, will constitute a violation of the Jencks Act.

#### 1. Nix's Notes

18 U.S.C. §3500(b) says:

> After a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United States to produce any statement . . . of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified.

The Government says it will call Nix not only to lay a foundation for the audio recording, but also to testify about conversations he had with O'Reilly before the audio recording was made. Questions raised are: (1) whether Nix's notes qualify as "statements" under the Jencks Act; (2) whether Nix's notes were in the "possession of

13

the United States"; and (3) what remedy the Court should impose.

> The term "statement" . . . in relation to any witness called by the United States, means[] a written statement made by said witness and signed or otherwise adopted or approved by him[.]

18 U.S.C. §3500(e)(1).

O'Reilly is concerned about Nix's own statements in his notes, rather than O'Reilly's statements. However, Nix's testimony is that his notes only contained O'Reilly's statements. In addition, at the hearing, Nix adopted the entirety of the FD-302s as his statements. If he is to be believed, there is no Jencks Act violation, since the FD-302s have all been produced.

The Court need not address the other elements of a possible Jencks Act violation.

### 2. FD-302s From Meetings Between July 25, 2004 and August 2, 2004

Nix wrote a letter to SA Higginbotham dated August 2, 2004. The letter says, "I have just return[ed] from our visit and there was[sic] a few things I wanted to mention but due[] to the time we had, I didn't get to them."

Based on this letter, O'Reilly says there are FD-302s from meetings FBI agents had with Nix between July 25, 2004 and August 2, 2004, which constitute Jencks material, that the Government has not disclosed.

At the end of the letter dated August 2, 2004, Nix says: "P.S. I saw the Parole Board on Aug. 25, 2004." The Court finds the August 2, 2004 letter is mis-dated, the letter should have been dated September 2, 2004, and there are no missing FD-302s.

14

## IV. CONCLUSION

O'Reilly's motion is **DENIED WITHOUT PREJUDICE**, since the *Brady* violation can only be asserted post-trial, and a violation of the Jencks Act can only be asserted after the witness testifies on direct examination.

O'Reilly made a Confrontation Clause argument at the hearing. He said that if the Court excludes Mr. Nix's testimony, O'Reilly will be deprived of his ability to cross-examine Mr. Nix on the audio recording. *See Crawford v. Washington*, 541 U.S. 36 (2004). Since the Court declines to exclude Mr. Nix's testimony, this argument is moot.

**IT IS ORDERED**.

s/Victoria A. Roberts
Victoria A. Roberts
United States District Judge

Dated: July 9, 2010

---

The undersigned certifies that a copy of this document was served on the attorneys of record by electronic means or U.S. Mail on July 9, 2010.

s/Linda Vertriest
Deputy Clerk

---